FILED

2013 APR 17 PM 4:54

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2013 Grand Jury

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR No. 09-466(A)-DSF |
| Plaintiff, | ) | |
| | ) | **F I R S T** |
| v. | ) | **S U P E R S E D I N G** |
| | ) | **I N D I C T M E N T** |
| PAUL MILTON CORTEZ JOVEL, | ) | [18 U.S.C. § 1962(d): Racketeer |
| aka "Paul Milton Jovel | ) | Influenced and Corrupt |
| Cortez," | ) | Organizations Conspiracy] |
| aka "Oscar Chacon," | ) | |
| aka "Little Man," | ) | |
| PEDRO ALONSO LOPEZ, | ) | |
| aka "Grumpy," | ) | |
| KELVIN ALEXANDER MELGAR, | ) | |
| aka "Kelvin Alexander | ) | |
| Melgar Alas," | ) | |
| aka "Pain," | ) | |
| CARLOS IVAN CUENTAS, | ) | |
| aka "Carlos Yvonne | ) | |
| Cuentas," | ) | |
| aka "Carlos Juan Cuentas," | ) | |
| aka "Snoopy," | ) | |
| aka "El Narizon," | ) | |
| aka "Blinky," | ) | |
| | ) | |
| Defendants. | ) | |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

A.    RACKETEERING ENTERPRISE

At all times relevant to this indictment:

1.    Defendants PAUL MILTON CORTEZ JOVEL, also known as ("aka") "Paul Milton Jovel Cortez," aka "Oscar Chacon," aka "Little Man" ("JOVEL"), PEDRO ALONSO LOPEZ, aka "Grumpy" ("LOPEZ"), KELVIN ALEXANDER MELGAR, aka "Kelvin Alexander Melgar Alas," aka "Pain" and CARLOS IVAN CUENTAS, aka "Carlos Yvonne Cuentas," aka "Carlos Juan Cuentas," aka "Snoopy," aka "El Narizon," aka "Blinky" ("CUENTAS") (collectively, the "defendants"), and others known and unknown to the Grand Jury, were members of Mara Salvatrucha, otherwise known as MS-13 (hereinafter referred to as "MS-13"), a criminal organization whose members and associates engaged in numerous acts of violence and other crimes, including murder, conspiracy to commit murder, narcotics trafficking, extortion, robbery, assault, obstruction of justice, and witness tampering.

2.    MS-13, including its leadership, membership, and associates, constitutes an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, although not a legal entity, which is engaged in, and the activities of which affect, interstate and foreign commerce.

3.    MS-13 operates in the Central District of California, and elsewhere within and outside of the United States, and constitutes an ongoing organization whose members function as a

2

1   continuing unit for a common purpose of achieving the objectives

2   of the enterprise.

3        4.    Defendants JOVEL, LOPEZ, MELGAR, and CUENTAS, and

4   others known and unknown to the Grand Jury, participated in the

5   operation, organization, and leadership of MS-13.

6   B.   GENERAL BACKGROUND

7        At all times relevant to this Indictment:

8        5.    MS-13 was formed in Los Angeles, California, in the

9   mid-1980s by immigrants fleeing the civil war in El Salvador.

10  The term "Mara" is a general Spanish slang term for "gang."  The

11  term "Salvatrucha" combines two phrases.  "Salva" refers to the

12  nation of El Salvador.   The term "trucha," meaning "look out" or

13  "heads up," was adopted by MS-13 from other Hispanic gangs in

14  Los Angeles, whose members often shouted "trucha" as a way to

15  alert each other to the presence of the police.   The number

16  "13," which stands for the letter "M," the 13th letter of the

17  alphabet, was added to the gang's name in the mid-1990s, when

18  MS-13 became associated with the Mexican Mafia.   The Mexican

19  Mafia, commonly referred to as "la EME" (which translates in

20  English as "the M"), is a criminal organization that operates

21  within the prison system and exercises control over the Hispanic

22  street gangs of Southern California.

23       6.    Over the years, as members of MS-13 were deported to

24  El Salvador, or traveled to other locations in the United States

25  and abroad, MS-13 spread.   MS-13 operates as a national and

26  international criminal organization, with tens of thousands of

27  members regularly conducting gang activities in at least ten

28  states and Washington, D.C., and with thousands more conducting

1  such gang activities in Central America and Mexico.  MS-13 is

2  considered one of the largest and most violent gangs in the

3  world.

4       7.  MS-13 operates through subsets known as "cliques,"

5  which are usually named for a street within a clique's territory

6  or for the neighborhood in which the clique operates.  Each

7  clique has one or more leaders, commonly referred to as "shot

8  callers," who are responsible for, among other things, managing

9  the narcotics trafficking operation in the clique's territory,

10  collecting extortion payments, directing the day-to-day

11  management of the clique, enforcing MS-13's rules, and resolving

12  intra-clique disputes.  Shot callers are also responsible for

13  meeting with other clique leaders in order to achieve their

14  common criminal purposes and to resolve disputes between

15  cliques.

16      8.  In Los Angeles, many, though not all, MS-13 cliques

17  operate within two areas of control:  Hollywood and Rampart.

18  The Hollywood area of control is bounded by Lexington Street to

19  the north, El Centro Avenue to the west, Melrose Avenue to the

20  south, and Normandie Street to the east.  The Rampart area of

21  control is bounded by 3rd Street to the north, Western Avenue to

22  the west, Olympic Boulevard to the south, and Virgil Avenue to

23  the east.  The cliques that operate within MS-13's Hollywood

24  area of control are the Hollywood Locos and Harvard Criminals

25  cliques.  The cliques that operate within MS-13's Rampart area

26  of control are the Rampart, Francis, Leeward, Parkview,

27  Normandie, and Coronado cliques.  MS-13 also maintains cliques

28  in other parts of Los Angeles County.

1      9.   A clique adds new members through an initiation ritual

2  known as "jumping in," during which several existing gang

3  members beat up a prospective member for 13 seconds.  Once

4  "jumped in," a gang member is expected to participate fully in

5  MS-13's criminal activities.

6      10.  MS-13 enforces its rules and promotes discipline among

7  its members and associates by imposing monetary fines and by

8  threatening and committing acts of violence against those

9  members and associates of the organization who violate the rules

10  of or pose a threat to the enterprise.  MS-13 members also

11  engage in acts of violence against innocent citizens in the

12  gang's territory and against rival gang members who venture into

13  its territory.  Participation in violent acts directed by the

14  gang leadership or in the presence of other gang members

15  particularly increases the respect accorded that member and

16  results in that member maintaining or increasing his position in

17  MS-13.  In addition, violent acts committed by MS-13 members

18  enhance the gang's overall reputation for violence in the

19  community, resulting in the intimidation of citizens in MS-13

20  territory and the reinforcement of the gang's control of those

21  areas of Los Angeles in which it operates.  MS-13 members are

22  aided in their criminal endeavors by other trusted individuals,

23  referred to herein as "associates," who participate in the

24  various activities of the cliques and its members.

25      11.  Members of MS-13 frequently, though not always,

26  signify their membership in the gang with tattoos reading "Mara

27  Salvatrucha," "MS," "MS-13," or other variations of the gang's

28  name.  MS-13 members frequently refer to one another by gang

1    monikers, or nicknames, and often do not know fellow gang

2    members' legal names.

3          12.   Narcotics sales provide the bulk of MS-13's profits.

4    In each clique's territory, the narcotics are supplied by a

5    "mayorista," or wholesaler, and are usually, but not always,

6    sold on the street by "traqueteros," sellers who are often not

7    members of MS-13 but who are allowed to sell narcotics within

8    the clique's territory on the condition that they buy the drugs

9    they sell exclusively from the clique's mayorista and pay weekly

10   "rent" to the clique.  Non-member associates of MS-13, often

11   referred to as "workers," are sometimes used to distribute drugs

12   to the traqueteros and collect rent from them.  Clique members

13   provide protection to the traqueteros from robbers and

14   competitors.  Traqueteros who violate this arrangement are

15   subject to reprisals, including threatened and actual acts of

16   violence.

17         13.   Profits for the MS-13 gang are also generated from

18   robberies, routine extortions of legitimate and illegitimate

19   food vendors, and other business owners operating within MS-13

20   territory, as well as from additional miscellaneous crimes

21   committed by MS-13 members.  Members are expected to contribute

22   a portion of the proceeds of their crimes towards the gang.  In

23   addition to generating profits, these crimes of intimidation

24   also further the enterprise by establishing and maintaining MS-

25   13's control over its territory by instilling fear in the

26   populace.

27         14.   In Los Angeles, each clique contributes a portion of

28   its profits towards a tax paid by MS-13 to the Mexican Mafia.

1  Like all gangs associated with the Mexican Mafia, MS-13 is
2  required to pay a specified sum of money on a regular basis to a
3  member of the Mexican Mafia.  Members of the Mexican Mafia are
4  commonly referred to as "big homies," "tios" (Spanish for
5  "uncles"), "carnals" (Spanish slang for "brothers"), and/or
6  "señors" (a Spanish title of respect for a man).  In return for
7  the tax payments, the Mexican Mafia provides protection to all
8  MS-13 members incarcerated in county, state, and federal prisons
9  and jails in California.  Failure to pay the tax will result in
10  a "green light" being placed on MS-13, that is, a general order
11  from the Mexican Mafia to assault or kill any incarcerated MS-13
12  member in any facility controlled by the Mexican Mafia.  Also,
13  in return for these tax payments, the Mexican Mafia ensures that
14  no other gang operates in MS-13's territory or otherwise
15  interferes with the criminal activities of MS-13.

16       15.  Since the mid-1990s, when MS-13 became associated with
17  the Mexican Mafia, a single powerful MS-13 member in Los Angeles
18  has been appointed to act as MS-13's representative to the
19  Mexican Mafia ("the EME representative").  The EME
20  representative works as a "soldier" for the Mexican Mafia and is
21  responsible for, among other things, ensuring that MS-13 pays
22  its tax; setting policies to manage and discipline MS-13 members
23  and associates; organizing and conducting meetings among MS-13
24  shot callers on a regular basis; resolving disputes between MS-
25  13 cliques and members; organizing MS-13 cliques to generate
26  money through, among other things, narcotics trafficking; and
27  providing support to, and requesting assistance from, MS-13
28  leaders in El Salvador.

1     16.   In addition to the tax paid to the Mexican Mafia, MS-

2 13 utilizes the profits obtained through its illegal activities

3 by sending money to MS-13 members in prison in El Salvador,

4 purchasing weapons and narcotics, paying attorney's fees for

5 gang members who have been charged with committing crimes,

6 contributing to funeral costs for gang members who have been

7 killed, and putting money on the prison accounts of MS-13

8 members incarcerated in the United States.

9 C.   THE PARTIES

10     At all times relevant to this Indictment:

11     17.   Defendants LOPEZ, MELGAR, and CUENTAS were members and

12 shot callers of the Hollywood clique of MS-13.

13     18.   Defendant JOVEL was a member of the Parkview clique of

14 MS-13 and the overall leader of MS-13 in Los Angeles, as well as

15 MS-13's EME representative.

16 D.   PURPOSES OF THE ENTERPRISE

17     19.   The purposes of the enterprise include, but are not

18 limited to, the following:

19     a.   Enriching the members and associates of the

20 enterprise through, among other things, the sale and

21 distribution of drugs and the collection of rent from drug

22 traffickers and legitimate and illegitimate business persons

23 operating within its territory;

24     b.   Preserving and protecting the power, territory,

25 and profits of the enterprise, its members and associates,

26 through threats of violence and actual acts of violence,

27 including assault, robbery, and murder;

28

1              c.    Promoting and enhancing the enterprise and the

2    activities of its members and associates; and

3              d.    Providing assistance and protection to other

4    members of the enterprise, including by intimidating and

5    murdering potential witnesses against members of the enterprise.

6    E.    MEANS AND METHODS OF THE ENTERPRISE

7         20.   Among the means and methods by which the defendants

8    and other members and associates of the enterprise conduct and

9    participate in the conduct of the affairs of the enterprise are

10   the following:

11             a.    Members and associates of the enterprise conspire

12   to commit, commit, and attempt to commit acts of violence,

13   including murder, to protect and expand the enterprise's

14   criminal operations;

15             b.    Members and associates of the enterprise acquire,

16   possess, carry, and use deadly weapons, including firearms, in

17   the course of the enterprise's criminal activities;

18             c.    Members and associates of the enterprise promote

19   a climate of fear in the community through threats of harm and

20   violence;

21             d.    Members and associates of the enterprise

22   participate in narcotics trafficking, including the purchase and

23   sale of crack cocaine, powder cocaine, crystal methamphetamine,

24   and marijuana;

25             e.    Members and associates of the enterprise use

26   various techniques to avoid law enforcement scrutiny of the

27   enterprise's criminal activities and to evade and frustrate law

28   enforcement, such as the use of coded language to discuss

1    criminal activities and other counter-surveillance techniques;

2    and

3             f.    Members and associates of the enterprise

4    frustrate investigations of their criminal conduct by, among

5    other things, attempting to destroy evidence and intimidating

6    witnesses through threats of violence and actual violence,

7    including assault and murder.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT ONE

[18 U.S.C. § 1962(d)]

1.     Paragraphs One through Twenty of the Introductory
Allegations of this Indictment are realleged and incorporated by
reference as though fully set forth herein.

2.     Beginning on a date unknown to the Grand Jury, but
certainly by in or around 1995, and continuing until in or about
May 2009, in Los Angeles County, within the Central District of
California, and elsewhere, defendants JOVEL, LOPEZ, MELGAR, and
CUENTAS, and others known and unknown to the Grand Jury being
persons employed by and associated with the MS-13, an
enterprise, as more fully described in Paragraphs One through
Twenty of the Introductory Allegations of this Indictment, which
engaged in, and the activities of which affected, interstate and
foreign commerce, unlawfully and knowingly combined, conspired,
confederated, and agreed together to violate Title 18, United
States Code, Section 1962(c), that is, to conduct and
participate, directly and indirectly, in the conduct of the
affairs of the enterprise through a pattern of racketeering
activity, as that term is defined in Title 18, United States
Code, Sections 1961(1) and 1961(5), consisting of multiple acts
indictable under the following provisions of federal law:

            a.     18 U.S.C. § 1512 (witness intimidation);

            b.     21 U.S.C. § 841(a)(1) (possession with intent to
distribute/distribution/aiding and abetting the distribution of
illegal controlled substances);

            c.     21 U.S.C. § 846 (drug trafficking conspiracy);
and multiple acts involving:

1         d.    murder, in violation of California Penal Code

2 Sections 187 and 190;

3         e.    extortion, in violation of California Penal Code

4 Sections 518, 519, and 524.

5     It was a further part of the conspiracy that each of the

6 above-named defendants agreed that a co-conspirator would commit

7 at least two acts of racketeering in the conduct of the affairs

8 of the enterprise.

9 A.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

10    ACCOMPLISHED

11     The objects of the conspiracy were to be accomplished, in

12 substance, as follows:

13     3.  Defendants JOVEL, LOPEZ, MELGAR, and CUENTAS, and

14 others known and unknown to the Grand Jury, would identify and

15 recruit wholesale drug suppliers and street drug dealers to

16 engage in the distribution and sale of drugs in MS-13 territory.

17     4.  Defendants JOVEL, LOPEZ, MELGAR, and CUENTAS, and

18 others known and unknown to the Grand Jury, would negotiate

19 prices and quantities of drugs, including methamphetamine and

20 cocaine base in the form of crack cocaine, to be distributed

21 among wholesale suppliers and street dealers selling narcotics

22 in MS-13 territory.

23     5.  Defendants JOVEL, LOPEZ, MELGAR, and CUENTAS, and

24 others known and unknown to the Grand Jury, would possess with

25 intent to distribute, distribute, and facilitate the

26 distribution of controlled substances, including methamphetamine

27 and cocaine base in the form of crack cocaine.

28

6. Defendants JOVEL, LOPEZ, MELGAR, and CUENTAS, and others known and unknown to the Grand Jury, would inform street drug dealers that they were required to obtain specific quantities of drugs exclusively from wholesalers and suppliers designated by MS-13.

7. Defendants JOVEL, LOPEZ, MELGAR, and CUENTAS, and others known and unknown to the Grand Jury, would instruct the wholesale suppliers and street drug dealers that they were required to pay rent, typically a portion of their proceeds from the sales of drugs, to MS-13 in order to continue their drug trafficking activities in MS-13 territory, with the protection of MS-13 from competition or interference from rival drug dealers, robbers, and other gangs, and that the failure to do so would result in retribution, including fines and acts of violence, directed at them by MS-13. MS-13 members and associates generally were exempt from having to pay such rent.

8. Defendants JOVEL, LOPEZ, MELGAR, and CUENTAS, and others known and unknown to the Grand Jury, would collect rent at regular intervals from drug wholesaler drug suppliers and street drug dealers in MS-13 territory.

9. Defendants JOVEL, LOPEZ, MELGAR, and CUENTAS, and others known and unknown to the Grand Jury, would use intimidation, threats of violence, and actual violence in order to demand that shop owners and street vendors engaged in commerce in MS-13 territory pay rent to MS-13, in exchange for which they were allowed to operate their businesses within MS-13 territory without interference from MS-13. Rent collected from the narcotics traffickers and extorted from street vendors and

1    shop owners would be delivered to the MS-13 shot callers,

2    including but not limited to, defendants JOVEL, LOPEZ, MELGAR,

3    and CUENTAS.

4         10.   Defendant JOVEL, and others known and unknown to the

5    Grand Jury, would deliver, or cause to be delivered, a portion

6    of the MS-13 rent proceeds to the Mexican Mafia, through

7    designated intermediaries.

8         11.   Defendants JOVEL, LOPEZ, MELGAR, and CUENTAS, and

9    others known and unknown to the Grand Jury, would enforce their

10   control over the commerce and criminal activities conducted in

11   MS-13 territory by employing intimidation, violence, and threats

12   of violence against individuals who did not comply with MS-13

13   directives.   Defendants JOVEL, LOPEZ, MELGAR, and CUENTAS, and

14   others known and unknown to the Grand Jury, would either engage

15   in such enforcement acts directly, or order subordinate MS-13

16   members and associates to carry out such enforcement acts.

17        12.   Defendants JOVEL, LOPEZ, MELGAR, and CUENTAS, and

18   others known and unknown to the Grand Jury, would further

19   maintain MS-13's control of its territory by engaging in acts of

20   intimidation, threats of violence, and actual violence against

21   individuals who were, or who were perceived by the MS-13 members

22   to be, members of rival gangs to the MS-13, to prevent those

23   gangs from encroaching on MS-13 territory, conducting drug

24   trafficking or criminal activities in MS-13 territory, or

25   otherwise competing with the criminal operations of the

26   enterprise.

27        13.   Defendants JOVEL, LOPEZ, MELGAR, and CUENTAS, and

28   others known and unknown to the Grand Jury, would further

14

1  maintain MS-13's control of its territory by allying the MS-13

2  with the Mexican Mafia, and paying "taxes" to the Mexican Mafia

3  in return for the Mexican Mafia's protection and authorization

4  to control drug trafficking and other illegal activities in MS-

5  13 territory.

6      14.   Through the collection of rent and the control of

7  commerce and criminal activity in MS-13 territory, defendants

8  JOVEL, LOPEZ, MELGAR, and CUENTAS, and others known and unknown

9  to the Grand Jury, operated an enterprise generating significant

10 proceeds from narcotics trafficking and other illegal activity

11 in MS-13 territory.   The proceeds of the drug trafficking and

12 other illegal activities controlled by MS-13 generated profits

13 for MS-13 and its individual members and associates.

14 B.   OVERT ACTS

15     15.   In furtherance of the racketeering conspiracy and to

16 accomplish its objects, defendants JOVEL, LOPEZ, MELGAR, and

17 CUENTAS, and others known and unknown to the Grand Jury,

18 committed various overt acts, in Los Angeles County, within the

19 Central District of California, and elsewhere, including, but

20 not limited to, the following:

21          (1)   On or about March 9, 1996, defendant LOPEZ, and

22 other MS-13 members, shot and killed S.B. in the Echo Park area

23 of Los Angeles, California.

24          (2)   On or about October 21, 1998, defendant CUENTAS

25 violated a City of Los Angeles gang injunction by associating

26 with MS-13 members in MS-13 territory.

27

28

1        (3)   On or about November 17, 1998, defendant CUENTAS

2  resisted arrest and threatened to kill a Los Angeles Police

3  Department ("LAPD") officer.

4        (4)   On or about May 11, 2002, defendant CUENTAS

5  violated a City of Los Angeles gang injunction by associating

6  with MS-13 members at the intersection of Santa Monica Boulevard

7  and Western Avenue.

8        (5)   In January 2006, defendant LOPEZ attended an MS-

9  13 party and posed for a photograph with other MS-13 members.

10        (6)   On or about March 13, 2006, defendant LOPEZ shot

11  and killed L.G. in the vicinity of Kingsley Avenue in Los

12  Angeles, California.

13        (7)   On or about March 22, 2006, defendant LOPEZ lied

14  about his true name and date of birth to LAPD officers who were

15  trying to effectuate defendant LOPEZ's arrest for the murder of

16  L.G.

17        (8)   On or about April 15, 2006, defendant JOVEL spoke

18  to an MS-13 member about gang business.

19        (9)   On or about June 30, 2006, defendant JOVEL spoke

20  to an MS-13 member about the murder of another MS-13 member in

21  El Salvador and other gang business.

22        (10) On or about July 25, 2006, defendant LOPEZ said

23  in a phone call that he jumped someone in Los Angeles County

24  Jail into MS-13.

25        (11) On or about July 25, 2006, defendant LOPEZ asked

26  his sister why she had not picked up the money that the clique

27  collected on his behalf.

28

1     (12) On or about July 25, 2006, defendant LOPEZ spoke

2 to defendant CUENTAS about recruiting gang members to file

3 complaints against LAPD Detective Frank Flores.

4     (13) On or about July 25, 2006, defendant LOPEZ talked

5 to an MS-13 member about other MS-13 gang members in Los Angeles

6 County Jail.

7     (14) On or about July 26, 2006, defendant LOPEZ told

8 an MS-13 member to inquire about Detective Flores, who LOPEZ

9 blamed for his murder case.

10     (15) On or about July 26, 2006, defendant LOPEZ told

11 an MS-13 member that LOPEZ had "authority" within MS-13 in the

12 Los Angeles County Jail.

13     (16) On or about July 26, 2006, defendant LOPEZ said

14 that he and other MS-13 members had to investigate Detective

15 Flores because Detective Flores was "coming after" LOPEZ.

16     (17) On or about July 26, 2006, defendants LOPEZ and

17 CUENTAS discussed CUENTAS' search for a witness to testify

18 favorably for LOPEZ in his murder case.

19     (18) On or about July 26, 2006, defendant LOPEZ talked

20 to his sister about instructing a witness in his murder case to

21 testify falsely.

22     (19) On or about July 26, 2006, defendant LOPEZ talked

23 to his sister about bribing a witness in his murder case with

24 $500 in counterfeit currency.

25     (20) On or about July 26, 2006, defendant LOPEZ talked

26 to an MS-13 member about ways to obtain individuals' credit card

27 numbers and personal identifiers and how to use that information

28 to pay bills.

1        (21) On or about July 26, 2006, defendant LOPEZ told

2   an MS-13 member ("MS-13 member 1") that when another MS-13

3   member ("MS-13 member 2") came across credit card profiles while

4   robbing people, MS-13 member 2 should provide that information

5   to MS-13 member 1, who should then give that information to

6   LOPEZ.

7        (22) On or about July 26, 2006, defendant LOPEZ

8   discussed with another MS-13 member bribing a witness in his

9   murder case with counterfeit currency.

10        (23) On or about August 1, 2006, defendant JOVEL and

11   another MS-13 member provided another individual with $4,000 in

12   cash to purchase approximately 114.4 grams of actual

13   methamphetamine and instructed the individual to sell the

14   methamphetamine on the street and return the profits to JOVEL.

15        (24) On or about August 2, 2006, defendant JOVEL and

16   another MS-13 member met with an individual at the corner of

17   Olympic Boulevard and Catalina Street in Los Angeles, where the

18   individual gave JOVEL and the other MS-13 member $2,000 in cash.

19        (25) On or about August 4, 2006, defendant JOVEL and

20   another MS-13 member met with an individual at the corner of 8th

21   Street and Berendo Street in Los Angeles, where the individual

22   gave them $6,000 in cash.

23        (26) On or about August 29, 2006, defendant MELGAR

24   sold approximately 61.5 grams of actual methamphetamine.

25        (27) On or about September 17, 2006, defendant JOVEL

26   attended a gang meeting with other members of MS-13 at which

27   JOVEL and other MS-13 members discussed extorting money from

28

1   drug dealers and vendors in MS-13 territory and other gang

2   business.

3           (28) On or about October 28, 2006, defendant JOVEL

4   shot and killed J.B. in the vicinity of Chevy Chase Park in Los

5   Angeles, California.

6           (29) On or about December 1, 2006, defendant MELGAR

7   spoke with another MS-13 member about whether an individual had

8   been accepted into MS-13 without approval, as well as the need

9   for a meeting and for defendant CUENTAS to send money to an MS-

10  13 member in prison in El Salvador.

11          (30) On or about December 2, 2006, defendant LOPEZ

12  told defendant MELGAR that he wanted witnesses to lie for him in

13  court in his murder case, and MELGAR told LOPEZ that another MS

14  -13 member would make such arrangements.

15          (31) On or about December 4, 2006, defendant MELGAR

16  asked another MS-13 member to affirm his loyalty to the

17  Hollywood Locos Clique.

18          (32) On or about December 4, 2006, using coded

19  language, defendants JOVEL and MELGAR discussed their drug

20  trafficking business.

21          (33) On or about December 6, 2006, defendant LOPEZ

22  spoke to defendant MELGAR about how a witness in his murder

23  trial should testify, saying the witness should say he made a

24  mistake when he identified LOPEZ as the person who shot and

25  killed L.G.

26          (34) On or about December 7, 2006, defendant MELGAR

27  declined to provide another MS-13 member with an eighth of an

28

1   ounce of narcotics and instead informed the MS-13 member that he

2   was only selling ounces of pure methamphetamine.

3          (35) On or about December 7, 2006, using coded

4   language, defendants JOVEL and MELGAR discussed how to conceal a

5   drug "stash."

6          (36) On or about December 8, 2006, defendant MELGAR

7   told a prospective narcotics purchaser that the price for a

8   quantity of narcotics was $800 per ounce.

9          (37) On or about December 11, 2006, defendant LOPEZ

10  ended a call with defendant MELGAR by saying:   "Trucha!"

11         (38) On or about December 12, 2006, defendant MELGAR

12  explained to another MS-13 member how to dilute ("cut")

13  narcotics for sale.

14         (39) On or about December 12, 2006, defendant MELGAR

15  sold approximately 56.5 grams of actual methamphetamine.

16         (40) On or about December 13, 2006, defendant MELGAR

17  discussed providing a mobile telephone to be smuggled into a

18  prison in El Salvador for use by an incarcerated MS-13 member.

19         (41) On or about December 13, 2006, defendant MELGAR

20  discussed the status of a new member of the Hollywood clique

21  with an MS-13 member in prison in El Salvador.

22         (42) On or about December 14, 2006, defendant MELGAR

23  discussed how small the mobile telephone would need to be in

24  order to smuggle it into a prison in El Salvador.

25         (43) On or about December 14, 2006, defendant MELGAR

26  informed another MS-13 member about the weight of a "teener" of

27  narcotics.

28

1        (44) On or about December 16, 2006, defendant LOPEZ

2  exchanged gang greetings in a phone call with defendant MELGAR.

3        (45) On or about December 16, 2006, defendant LOPEZ

4  told defendant MELGAR that he spoke with a witness from his

5  murder case to remind him of their "agreement" and tell the

6  witness not to make trouble.

7        (46) On or about December 17, 2006, defendant LOPEZ

8  told defendant MELGAR that when LOPEZ next saw the witness in

9  court, he was going "to let him have it" because the witness

10  "promised" him everything and gave him nothing.

11        (47) On or about December 17, 2006, defendant MELGAR

12  discussed with MS-13 members imprisoned in El Salvador the need

13  to have a meeting with MS-13 members in Los Angeles, including

14  defendant CUENTAS.

15        (48) On or about December 18, 2006, defendant MELGAR

16  spoke to defendant LOPEZ's sister, who said she was having

17  "trouble" with a witness in LOPEZ's murder case because the

18  witness did not want to go to the Department of Motor Vehicles

19  ("DMV"); and MELGAR recommended that LOPEZ's sister obtain the

20  witness' information and go to the DMV for him.

21        (49) On or about December 21, 2006, defendant LOPEZ

22  informed defendant MELGAR that a witness did not identify LOPEZ

23  at his preliminary hearing in his murder case.

24        (50) On or about December 21, 2006, defendant LOPEZ

25  talked to an MS-13 member about killing Detective Flores.

26        (51) On or about December 23, 2006, defendant MELGAR

27  told defendant LOPEZ, using coded language, that MELGAR's

28  methamphetamine disappeared.  In the same call, LOPEZ reminded

1    MELGAR about taking care of Detective Flores and asked MELGAR to

2    speak with another MS-13 member about it.

3            (52) On or about December 24, 2006, defendant MELGAR

4    told defendant JOVEL during a telephone call, using coded

5    language, that MELGAR's methamphetamine had been stolen.

6            (53) On or about December 24, 2006, defendant MELGAR

7    told another MS-13 member during a telephone call, using coded

8    language, that MELGAR's methamphetamine had been stolen and that

9    LOPEZ said he would handle it when he was released from jail.

10           (54) On or about December 26, 2006, defendant MELGAR

11   told defendant LOPEZ that all of MELGAR's methamphetamine had

12   disappeared and that it was likely that another MS-13 member had

13   stolen it.

14           (55) On or about December 29, 2006, defendant MELGAR

15   informed another MS-13 member that he had lost his narcotics.

16           (56) On or about December 29, 2006, defendant MELGAR

17   spoke with another MS-13 member about the need for defendant

18   CUENTAS to take responsibility for collecting and distributing

19   extortion proceeds.

20           (57) On or about December 29, 2006, defendant MELGAR

21   asked another MS-13 member to call defendant JOVEL so they could

22   discuss what to do about another, unidentified MS-13 member, aka

23   "Crook."

24           (58) On or about December 29, 2006, defendants MELGAR

25   and JOVEL discussed gang business, including what to do about

26   MS-13 member "Crook."

27

28

1       (59) On or about December 29, 2006, defendant MELGAR

2   granted the request of an MS-13 member imprisoned in El Salvador

3   to be put on a list of members to receive money.

4       (60) On or about January 7, 2007, defendant MELGAR

5   authorized MS-13 to administer a beating to an MS-13 member.

6       (61) On or about January 7, 2007, defendant MELGAR

7   discussed with another individual that MELGAR believed that

8   local and federal law enforcement personnel were looking for

9   MELGAR and that MELGAR would either turn himself in, hide, or be

10  caught by law enforcement.

11      (62) On or about January 9, 2007, defendant LOPEZ

12  discussed with defendant MELGAR how to make sure the witness in

13  his murder case gave a false notarized statement.

14      (63) On or about January 10, 2007, defendant LOPEZ

15  talked to defendant MELGAR about proving that a witness in his

16  murder case had lied.

17      (64) On or about January 12, 2007, defendant MELGAR

18  discussed gang business with an MS-13 member, including the

19  arrest of another MS-13 member, concerns that the MS-13 member

20  might cooperate with law enforcement, and collection of the

21  weekly clique money.

22      (65) On or about January 12, 2007, defendant MELGAR

23  talked to an MS-13 member's girlfriend about the quantity of

24  drugs in the MS-13 member's possession when he was arrested and

25  depositing money into the MS-13 member's inmate account.

26      (66) On or about January 13, 2007, defendant MELGAR

27  told defendant JOVEL that the LAPD had another MS-13 member's

28  phone and that JOVEL should change his phone number immediately.

1    (67) On or about January 13, 2007, defendant MELGAR

2 instructed another MS-13 member to ask defendant CUENTAS about

3 the Hollywood Clique's money.

4    (68) On or about January 13, 2007, defendant MELGAR

5 discussed transferring another MS-13 member's drug clientele to

6 defendant JOVEL.

7    (69) On or about January 14, 2007, defendants LOPEZ

8 and MELGAR discussed the need for MELGAR to obtain a new

9 telephone following the arrest of an MS-13 member.

10    (70) On or about January 14, 2007, defendants LOPEZ

11 and MELGAR discussed the arrests of two other MS-13 members.

12    (71) On or about January 15, 2007, defendant MELGAR

13 discussed the discipline of an MS-13 member who later informed

14 law enforcement personnel that MELGAR and defendant CUENTAS were

15 in charge of the Hollywood Locos clique.

16    (72) On or about January 16, 2007, defendant MELGAR

17 told an MS-13 associate that he believed the MS-13 member who

18 informed law enforcement personnel that MELGAR and defendant

19 CUENTAS were in charge of the Hollywood Locos clique did so

20 because MELGAR had ordered him beaten.

21    (73) On or about January 27, 2007, defendant MELGAR

22 spoke with defendant CUENTAS about a former MS-13 shot caller

23 cooperating with law enforcement personnel, as well as CUENTAS'

24 handling of extortion proceeds.

25    (74) On or about January 29, 2007, defendant MELGAR

26 informed an MS-13 associate that he was using a pre-paid

27 telephone to contact other MS-13 members so that law enforcement

28 personnel did not become aware of his new telephone number.

1           (75) On or about January 29, 2007, defendant MELGAR

2  asked an MS-13 member to deposit $50 into another MS-13 member's

3  inmate account.

4           (76) On or about January 29, 2007, defendant MELGAR

5  asked an MS-13 member about the status of funds owed to MELGAR.

6           (77) On or about February 6, 2007, defendant MELGAR

7  spoke with an MS-13 associate about the merging of the Hollywood

8  and Rampart police stations, as well as a new law permitting

9  police officers to regularly interrogate gang members.

10          (78) On or about February 13, 2007, defendant MELGAR

11  asked defendant CUENTAS to discipline an MS-13 member for

12  keeping money for himself that was intended for incarcerated MS-

13  13 members.

14          (79) On or about February 13, 2007, defendant MELGAR

15  told defendant CUENTAS that he believed they were being

16  investigated by law enforcement personnel.

17          (80) On or about February 13, 2007, defendants MELGAR

18  and CUENTAS discussed collecting an extortion payment from a

19  dentist.

20          (81) On February 13, 2007, defendants CUENTAS and

21  MELGAR discussed how defendant LOPEZ was angry with an MS-13

22  member for talking to police officers about MS-13.

23          (82) On or about February 15, 2007, defendant JOVEL

24  sold approximately 29.3 grams of actual methamphetamine.

25          (83) On or about March 20, 2007, defendant JOVEL sold

26  approximately 39 grams of actual methamphetamine.

27          (84) On or about May 17, 2007, defendant JOVEL sold

28  approximately 15.3 grams of actual methamphetamine.

1      (85) On or about May 24, 2007, defendant JOVEL sold

2  approximately 14.3 grams of actual methamphetamine.

3      (86) On or about May 24, 2007, defendant JOVEL sold

4  approximately 27.5 grams of cocaine base in the form of crack

5  cocaine.

6      (87) On or about June 8, 2007, defendant JOVEL sold

7  approximately 83.9 grams of cocaine base in the form of crack

8  cocaine.

9      (88) On or about June 20, 2007, defendant JOVEL sold

10 approximately 15.3 grams of actual methamphetamine.

11     (89) On or about July 10, 2007, defendant CUENTAS

12 distributed approximately 45 grams of cocaine base in the form

13 of crack cocaine.

14     (90) On or about May 13, 2008, defendant JOVEL wrote a

15 letter in which he identified an individual whom he believed to

16 be a cooperator and asked someone to tell another MS-13 member

17 not to cooperate with law enforcement personnel.

18     (91) On or about July 7, 2008, defendant JOVEL

19 discussed talking to another MS-13 member about not cooperating

20 with law enforcement.

21     (92) On or about July 9, 2009, defendant LOPEZ

22 possessed several law enforcement sensitive documents related to

23 the murder of a rival gang member by an MS-13 gang member.

24

25

26

27

28

NOTICE OF SPECIAL FINDINGS

Special Finding One (Narcotics Conspiracy)

Beginning on a date unknown to the Grand Jury, but certainly by in or around 1995, and continuing until in or around May 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants JOVEL, LOPEZ, MELGAR, and CUENTAS, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally possess with intent to distribute and to distribute at least 50 grams of actual methamphetamine, a Schedule II controlled substance, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1) and (b)(1)(A)(viii).

Special Finding Two (Murder of S.B.)

On or about March 9, 1996, in Los Angeles County, within the Central District of California, defendant LOPEZ willfully, deliberately, and with premeditation, unlawfully killed S.B. with malice aforethought, in violation of California Penal Code Sections 187 and 190.

Special Finding Three (Murder of L.G.)

On or about March 13, 2006, in Los Angeles County, within the Central District of California, defendant LOPEZ willfully, deliberately, and with premeditation, unlawfully killed L.G. with malice aforethought, in violation of California Penal Code Sections 187 and 190.

//

1    Special Finding Four (Murder of J.B.)

2         On or about October 28, 2006, in Los Angeles County, within

3    the Central District of California, defendant JOVEL willfully,

4    deliberately, and with premeditation, unlawfully killed J.B.

5    with malice aforethought, in violation of California Penal Code

6    Sections 187 and 190.

7

8                                      A TRUE BILL

9

10                                     /S/

11                                     Foreperson

12   ANDRÉ BIROTTE JR.
     United States Attorney

13

14

15   ROBERT E. DUGDALE
     Assistant United States Attorney

16   Chief, Criminal Division

17   ELIZABETH R. YANG
     Assistant United States Attorney

18   Chief, Violent and Organized Crime Section

19   GARTH E. HIRE
     JOANNA M. CURTIS

20   ROBYN K. BACON
     Assistant United States Attorneys

21   Violent and Organized Crime Section

22   KEVIN L. ROSENBERG
     Trial Attorney

23   United States Department of Justice

24

25

26

27

28

                              28